SCHEB, JOHN M., Senior Judge.
Appellant, the natural father of M.K.S, challenges the trial court’s order adjudicating his daughter a dependent child and placing her with relatives of her late mother. The court based its judgment on the father having abandoned his daughter. We find the evidence legally insufficient to support a finding of abandonment. We reverse.
Appellees, Linda and Richard Phelps, M.K.S.’s maternal great aunt and uncle, sought to have the court adjudicate M.K.S. a dependent child. A factual background is essential to understanding the posture of the case, which followed a somewhat different course than the usual path of a dependency proceeding.
Appellant and M.K.S.’s mother were married in January 1985. In July 1993, they separated, and the father moved to Illinois. In October 1994, them marriage was dissolved in Madison County, Illinois, and, by stipulation of the parties, the court awarded the mother custody of M.K.S., granted the father visitation rights, and required M.S. to pay $35 per week child support. The child remained with her mother in Tampa, Florida. In 1995, the mother was diagnosed with cancer. She succumbed on August 31,1996. At the time of the mother’s death M.K.S. was five years ten months old and was residing with the Phelpses where she had spent considerable time during her mother’s terminal illness.
About a year and one-half before she died, the mother wrote a “[t]o whom it may concern” letter acknowledging the father’s love of the child, but indicating she did not wish him to have custody of her. A few months before she died, she executed a will naming the Phelpses as guardians of the person of M.K.S.
M.S. had remarried and was living with his wife in Illinois in a home they purchased. After learning of his former wife’s death, he arrived in Tampa the day before the funeral. He came with the intention of taking his daughter back to Illinois, but the Phelpses sought to prevent him from removing the child from their care and control. Three days later, he was served with their petition seeking to enjoin him from removing M.K.S. from their custody on the ground that he was emotionally and economically unstable and had abandoned M.K.S. Concluding that it was not in the best interest of the child to be removed at that time, the court issued a temporary injunction prohibiting the father from removing M.K.S. and appointing a guardian ad litem. A few days later, the court ordered shelter care for M.K.S. with the Phelpses and denied M.S.’s motion to dissolve the injunction. The court ordered an Illinois home study of M.S. By December 1996, the Illinois home study had been completed. It revealed M.S. had a decent home environment. The study found nothing detrimental with respect to his character or fitness as a parent; however, it did not address M.K.S.’s reactions to her several visits with her father that took place in his home in the early months of 1997.
The court conducted an adjudicatory hearing on July 22, 1997, and a continuation thereof on September 22, 1997. The proceedings focused largely on whether the father had abandoned his daughter by having failed to give her adequate emotional and financial support since his separation from the child’s mother. The dependency hearing began taking on aspects of a disputed custody battle focusing on the best interests of M.K.S.
M.S. acknowledged that he had not personally visited his daughter during the three-year period following dissolution of his marriage. He sought to justify his lack of personal visitation on the ground that financial difficulties prevented him from making trips from Illinois to Florida. The evidence was conflicting as to the extent of communications the child received from her father. M.S. testified he frequently sent M.K.S. letters and that he sent her birthday and Christmas gifts. From July 1993 on, there were telephone calls between M.S. and his daughter from two to four times per month. The child’s mother often initiated these calls. M.S. said he had also sent videotapes to *311 M.K.S. of himself reading children’s stories. The maternal grandmother testified that there were one or two telephone calls per month between the child’s mother and M.S., at which time M.S. would talk with his daughter, and that in the eighteen months preceding the mother’s death, M.S. would call maybe once per month. A first cousin who frequently saw M.K.S. stated that sometimes there were birthday and Christmas gifts from M.S. and that the child’s mother received some support checks from him.
The guardian ad litem recommended the Phelpses have custody of M.K.S. and that the court determine whether M.K.S. was a dependent child. The guardian ad litem’s recommendation was based on M.S.’s lack of concern for M.K.S.’s best interest, his reluctance to allow the child to maintain future contact with the Phelpses, and the child’s preference.
Due to the father’s lack of records to support his payments, it was difficult for the court to determine precisely the extent of the father’s compliance with his child support obligation of $35 per week. He had held different jobs but has worked for the same printing company for the last few years and now regards his employment as stable. His bank statements showed that from March 1995 until the middle of July 1996 he paid a little over half of his court-ordered child support. Thus, although his contributions were sporadic, a fact he attributed to difficult financial circumstances, the evidence does not reveal a financial abandonment of M.K.S.
Dr. Sylvia Carra, the court-appointed psychologist, evaluated the parties involved. She found the child to be strongly bonded to Linda Phelps, a person the child grew close to when her mother died. M.K.S. now resides with the Phelpses and their thirteen-year-old daughter in a stable home. She is enrolled in the first grade and has a good relationship with the Phelps family. Dr. Carra found M.S., the father, responsible, stable, and reliable, although self-centered, a factor which limited his sensitivity to M.K.S. during her grief process over the death of her mother. She reported that the father believed the Phelpses had been destructive to M.K.S. by interfering with her bond with him. Still she viewed reunification with the father as an appropriate and important goal for the child. She found the father’s wife to be a nurturing person who was willing to take on a primary role with M.K.S. Although removal would present some trauma, she thought M.K.S. would be able to adapt, but that having no contact with the Phelpses would have a detrimental effect on her. Finally, the court asked Dr. Carra if M.S. had placed his desires over M.KS.’s. She responded that he had, but that it is appropriate that adults should make decisions for their children.
M.S. acknowledged a personal animosity toward the Phelpses. Initially, he testified that he would allow no further contact between M.K.S. and the Phelpses. Later, he said he would allow such contact if a counsel- or in Illinois recommends it. M.S.’s wife testified that she would honor M.K.S.’s expressed desire to maintain a relationship with the child’s extended maternal family in Tampa. She also recognized a need for further counseling from a counselor in Illinois.
The trial court found the father made no effort to visit or conduct regular contact with M.K.S. during her mother’s illness. The court observed that between July 1993 and August 1996, the father made minimal support payments, but did not make the required payments every week. The court concluded that there was “clear and convincing evidence and sufficient facts of abandonment ... that the placement of the child in the custody of the biological father will be detrimental to the welfare of the minor child, producing long-term, lasting and permanent psychological and emotional damage.” The court placed the child in the temporary legal custody of the Phelpses pursuant to section 39.41, Florida Statutes (1995). The court ordered yearly reviews of the status of the child and the parties with the court to “make such findings and rulings as are consistent with the manifest best interests of the child.”
The father raises issues concerning the procedural aspects of this proceeding, which, as noted, followed a somewhat different path from the typical dependency proceeding initiated by a social agency. We find it unnecessary to address these procedural concerns. *312 The core issue is whether the evidence produced justified a finding of dependency based on abandonment' of M.K.S. by her father.
Section 39.01, Florida Statutes (1995), defines abandonment as:
[A] situation in which the parent or legal custodian of a child, ... while being able, makes no provision for the child’s support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If the efforts of such parent ... to support and communicate with the child are, in the opinion of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned.
Section 744.301(1), Florida Statutes (1995), provides the mother and father jointly are natural guardians of their children during minority and that in the event of the death of one parent, the natural guardianship passes to the surviving parent. This is true where the ex-spouse who has had legal custody of the child dies. See Lusher v. Guardianship of Lusker, 434 So.2d 951 (Fla. 2d DCA 1983); Webb v. Webb, 546 So.2d 1062 (Fla. 3d DCA 1989).
The evidence before the trial court demonstrated a sporadic discharge by M.S. of his child support obligations. And while M.S. continued to be in touch with his daughter through mail communication, the evidence reveals his lack of personal visits with M.K.S. and his less-than-frequent telephone contacts with her. The principal basis for the court finding that M.K.S. would suffer emotional damage by being removed from the Phelpses and placed with her father appears to be that the father would not permit contact between the child and the Phelpses. Although it may be unfortunate, at least in the short term, to uproot M.K.S. from her present surroundings, this is not sufficient to deprive a natural parent of the right to have and rear his child. See Clock v. Clock, 649 So.2d 312 (Fla. 3d DCA 1995). Moreover, as the court observed, M.S. recanted his initial view not to permit such contact provided that a counselor in Illinois recommends it and finds that it will not damage the bonding relationship between M.K.S. and M.S.’s wife. His wife recognized the importance of the child’s relationship with her extended family, and the evaluating psychologist opined thei-e would be no long-term detriment to the child if contact with the Phelpses was maintained.
Although the father’s level of financial and emotional support of his daughter was less than exemplary, the evidence does not establish that he abandoned her. A surviving noncustodial father has the preemptive right to enjoy and rear his minor child. Where, as here, there is an issue of whether the surviving parent is to be deprived of custody after death of'the custodial parent, the test is not the “best interest of the child.” Rather, the court cannot deprive the surviving natural father of custody of his child unless the evidence demonstrates compelling reasons that the surviving parent is unfit or otherwise disabled from exercising custody and that placement of the child with the parent would endanger the safety and well-being of the child. See Filter v. Bennett, 554 So.2d 1184 (Fla. 2d DCA 1989); Roberts v. Florida Department of Children and Families, 687 So.2d 51 (Fla. 3d DCA 1997); In Re the Marriage of Matzen, 600 So.2d 487 (Fla. 1st DCA 1992). It is regrettable that removal of M.K.S. from the bond that has developed between her and the Phelpses may cause some short-term trauma; however, as noted, the evidence does not reveal that M.S. has abandoned his child. Nor does it indicate that M.S is unfit or that allowing him to have custody of his daughter would endanger her safety or well being. Accordingly, we find the evidence does not rise to the level required to deprive M.S. of his right to have custody of his child.
Reversed.
CAMPBELL, A.C.J., and QUINCE, J., concur.