767 So.2d 579 (2000)
S.C., as parent of A.L.S., and B.T.S., children, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, and R.J. and T.J., Appellees.
No. 5D99-2810.
District Court of Appeal of Florida, Fifth District.
September 8, 2000.
Ronald I. Cole, Ocala, for Appellant.
Diane Dylewski, Ocala, for Appellees, R.J. and T.J.
Joann M. Humburg, Ocala, for Appellee, Department of Children and Families.
GRIFFIN, J.
S.C. [the "mother"], the natural mother of A.S. and B.S., appeals an order adjudicating these two children to be dependent due to their abandonment by the mother. Because we find no evidence in the record to support a finding that the mother's conduct evinced a wilful rejection of her parental obligations, we reverse.
On June 4, 1999, Roy and Tammy Johnson, the paternal great-aunt and great-uncle of A.S. and B.S., filed a petition asking for the children to be adjudicated dependent.[1] Regarding the mother, the petition alleged that:
4. The natural mother, although able to care for and provide for her children, has neglected or abused or abandoned the children and by her actions has inflicted or created the risk of significant mental, physical or emotional injury to the children in that:
A. In September 1998, the mother left the twins with the petitioners, stating that she would return in two weeks and that the father would return for the children every night until the mother returned home. The mother has not moved back home since that time.
B. The mother has spent brief periods of time with her children since September 1998. On two occasions, the children became ill while in her care and she had to be forced to take them for medical attention. The mother then returned the children to the custodians who nursed them back to health.
C. The mother has provided no support to the custodians for the care of her children.
D. The mother does not have a suitable home for the children. She lives in a very old house with no heat, inadequate *580 wiring with lights hanging over beams, dog feces all over the house and garbage strewn everywhere.
The evidence at trial showed that the mother had known the father, Jason Simms, for a number of years, and had previously had a son by Simms. The mother and Simms, however, never married. A.S. and B.S. were born in January 1998. At the time, the mother was living with her own mother and the father was living with his parents. The parents began living together in March 1998 at the fathers' parents' home. The parents resided together from March of 1998 until August 28, 1998, when the mother left for Arizona. At trial, the mother claimed that she had been subpoenaed as a witness in a rape trial, but the father said that she did not provide this explanation when she left. Instead, she said she was going to visit relatives. The mother expected to be gone two weeks, but said that the trial took a month. She knew that the children's great-aunt, Tammy Johnson, would be caring for the children during the day and in fact left the children with her. She also signed a permission slip before she left which would allow Johnson to obtain medical care for the children in her absence.
The mother returned to Florida on October 1, 1998, but did not move back in with the father. She moved back in with her own mother, retrieving the two children. The mother lived with the two children in her mother's house until Thanksgiving, 1998. For Thanksgiving, the mother took one of the twins with her to Georgia, where she allegedly visited with family and saw a boyfriend. She left A.S. with her mother because she was ill. The mother testified that she called Simms to let him know where she was, and he asked her to bring him the children. The mother agreed and returned the children to their father the first week in December. She then went back to Georgia. She asked to have the children back after Christmas, and they were returned to her on December 27, 1998. The mother went back to Georgia with the children after Christmas, allegedly because she had a job interview at the Dollar Store. Two days after her return, B.S. got sick and was put in the hospital. She and A.S. stayed in the hospital with B.S. for four or five days. The mother spoke with the father while B.S. was in the hospital and again on January 6, 1999, about the time B.S. was released from the hospital. After speaking with Simms' mother, she agreed to let Simms' mother and aunt (Tammy Johnson) come and get the children. That same day, she interviewed for the Dollar Store job and was told she could start work on January 11, 1999. Johnson and Simms' mother arrived in Georgia on January 7, 1999. The mother said it was her understanding that the children would be cared for by the father's relatives during the day and that he would retrieve the children at night. The father testified the mother had placed the children in his care, that he had promised to return the children in February and that she kept in contact with him.
After the children's return to Florida, the father permitted Johnson to begin caring for the children on a full time basis without the mother's knowledge. The father acknowledged that he did not consult the mother about this decision, explaining that "I didn't figure she had any say so in it being that she wasn't there in the first place." The father admitted that the mother asked to have the children come up on several occasions. However, his family did not want the children to return to Georgia.
The mother testified that the first she learned of this was in March 1999, when the father and Johnson initiated a proceeding in Florida designed to give the Johnsons temporary custody and to cause the children to remain permanently in Florida.
Although the father and the Johnsons lost the hearing, they would not permit the children to visit with the mother in Georgia. The father acknowledges she made the request on several occasions and admitted that she called him on a regular *581 basis to ask about the kids. The father's mother, Ruth Simms, also testified that the mother generally called her once or twice a month to ask about the children. Although the children were not allowed to visit the mother in Georgia, the father said that she would have been permitted to see them had she been willing to come to Florida.
The mother said that after the dependency proceedings below were filed by Roy and Tammy Johnson on June 4, 1999, the father, for the first time, asked her to help with the children's support. After she was served, she decided to "let the system take its course." She did not contact the Johnsons again because she thought that they were "mad." The mother and her boyfriend moved back to Florida in late August 1999, approximately two weeks before trial was scheduled to begin.
Johnson said that the mother had called her only once since January 1999. Johnson said that she had never received any child support from the mother, but admitted she had never asked Johnson for any support.
At the conclusion of the hearing, the court found by a preponderance of the evidence that the twins had been abandoned by their Mother. The court explained:
My concern is that there is no evidence presented that the mother ever tried to talk directly with the children at any time during the course of these proceedings.
I find that the mother's attempts to communicate through the father are, in the opinion of the Court, only marginal efforts that do not evince a subtle [sic] purpose to assume all parental duties....
I further find that the mother at no time has provided any monetary support for the children.
* * *
I do find it was proved that in September 1998 the mother left the twins with the Petitioners stating that she would return in approximately, I'm inserting the words "approximately," two weeks. And that the father would return for the children every night until the mother returned home. The mother has not moved back home since that time.
A written order of disposition was entered on October 13, 1999 in which the twins were adjudicated dependent. Concerning the mother, the order stated:
1. The children were abandoned by the mother, [S. C.]
2. The mother's attempts to communicate with her children were marginal and do not evince a settled purpose to assume all parental duties.
3. It was not proven that the mother abused or neglected her children.
4. In September 1998, the mother left the twins with the petitioners, stating that she would return in approximately two weeks and that the father would return for the children every night until the mother returned home. The mother has not moved back home since that time.
5. The mother has spent brief periods of time with her children since September 1998.
The twins were ordered to remain in the Johnsons' temporary custody, with visitation to the mother. Both the mother and the father were ordered to pay support to the Johnsons in the amount of $71 per month and to pay one half of all uncovered medical expenses.
The mother is correct that the evidence in this case fails to support a finding that she "abandoned" the twins. "Abandonment" is statutorily defined as:
a situation in which the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the caregiver responsible for the child's welfare, *582 while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If the efforts of such parent or legal custodian, or caregiver primarily responsible for the child's welfare, to support and communicate with the child are, in the opinion of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. The term "abandoned" does not include a "child in need of services" as defined in chapter 984 or a "family in need of services" as defined in chapter 984. The incarceration of a parent, legal custodian, or caregiver responsible for a child's welfare may support a finding of abandonment.
§ 39.01(1), Fla. Stat. (1997).
Here, there simply is no evidence which would support a finding that the mother had engaged in conduct which evinced a willful rejection of parental obligations. Nor would the evidence support a finding that the mother's efforts were only marginal efforts to support and communicate with the children such that she failed to evince a settled purpose to assume parental duties.
The mother had actual physical custody of the children for alternating periods through January 1999. She remained in touch with the father about the children from January 1999 through June 1999, when the petition for dependency was filed, by phoning the father and/or his mother several times a month to discuss the children and/or ask them to send the children for a visit. Although the mother exercised no visitation with the children in Florida during this time, she was living in Georgia and was working full time. Furthermore, beginning in March 1999, she was involved in what was essentially a custody dispute with the father's family.
The mother's failure to provide financial support to the children under the circumstances of this case also appears insufficient to establish abandonment. Historically, each of the parties was used to supporting the children fully whenever that parent had custody of the children. No request for support was made until the petition for dependency filed by the Johnsons. See In re M.K.S., 726 So.2d 309 (Fla. 2d DCA 1998); Meredith v. Smith, 515 So.2d 1386 (Fla. 5th DCA 1987); Hinkle v. Lindsey, 424 So.2d 983 (Fla. 5th DCA 1983).
We agree with the trial judge that the mother's level of effort to be a mother to her children was weak, and we respect the court's determination to protect these children through a dependency proceeding as a prudent response to a disturbing pattern of poor parenting by both parents. Nevertheless, the pattern of conduct in evidence in this case is beneath the statutory threshold for abandonment, and the finding made by the trial court that the mother had "abandoned" the children within the meaning of Florida's dependency statutes has to be reversed.
REVERSED and REMANDED.
W. SHARP, J., concurs.
COBB, J., dissents, with opinion.
COBB, J., dissenting.
I would affirm on the authority of our opinion in In Interest of K.A.F., 442 So.2d 365 (Fla. 5th DCA 1983)(en banc).
NOTES
[1] The father was also involved in these proceedings, but appears to have agreed to the adjudication of dependency and consented to placement of the children with his aunt and uncle.